ALEXANDER E. HAMILTON *vs.* JEREMIAH SMITH ET AL.

Third Judicial District, Bridgeport, October Term, 1901.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

In 1866 certain oyster-grounds, designated by the proper committee to sundry persons in square one-acre lots, were staked or buoyed out, surveyed and mapped by *H*, since deceased, in parallel and contiguous tiers, like the squares of a checkerboard. *Held* that evidence that *H*, who acted as the duly authorized agent of the committee, gave to the owner of one of the lots as originally designated its lo-

Hamilton *v.* Smith et al.

cation and pointed out to him the boundary stakes, was admissible as showing what said committee deemed the true bounds of that lot, in a suit in which its bounds were in question.

A staking out of oyster-ground by such a committee stands upon the same footing, as matter of evidence, as a staking out by a grantor of land when he delivers possession.

The opinion of a witness as to the location of a surveyor's line between his land and that of an adjoining owner, although supported by long possession, is inadmissible.

The rule that an ancient document found in proper custody proves itself, is founded upon two grounds: the appearance of the document itself, and the difficulty, or impossibility, of making extrinsic proof.

A tracing made more than thirty years ago of an original map at that time on file in the town clerk's office, is itself an ancient document if found at such office; but a tracing of such tracing, made within ten years from the date of trial, is only secondary evidence of the original.

A witness who, in the exercise of his profession, has become familiar with the signature of another appended to public documents, is qualified to give his opinion as to the genuineness of such a signature, although he may never have seen such person write.

The value of testimony as to the handwriting of another must always depend on the actual familiarity with his handwriting in general, whether gained from seeing him write often or from seeing often what he wrote.

The fact that a question excluded on recross-examination was germane to the cross-examination, is immaterial, provided such question was not germane to the redirect examination.

The trial court has discretion to exclude a question which has but a remote tendency to prove the issue.

Upon rebuttal a surveyor testified that in 1885 he gave the places for setting stakes for east and west lines on the oyster-grounds within which was the *locus in quo*. *Held* that he should have been permitted to state over how much of the cove he ran these lines and gave the places for setting stakes, inasmuch as such inquiry would have tended to fix the line in dispute by definite monuments.

Evidence of declarations of an old inhabitant, since deceased, respecting the location of boundary lines, cannot be impugned by evidence of later inconsistent declarations made by him after the controversy between the parties to the suit had arisen, although before any suit was brought, and without knowledge of any dispute regarding the boundary line.

Argued November 19th, 1901—decided January 8th, 1902.

ACTION to restrain the defendants from removing buoys and stakes marking the boundary of the plaintiff's oyster-

ground, and for damages, brought to the Court of Common Pleas in New Haven County and tried to the court, *Hubbard, J.;* facts found and judgment rendered for the defendants, and appeal by the plaintiff for alleged errors in the rulings and findings of the court. *Error and new trial ordered.*

*William H. Ely,* for the appellant (plaintiff).

*Edward A. Harriman,* for the appellees (defendants).

BALDWIN, J. In 1866 the town of East Haven designated to sundry persons respectively, in square one-acre lots, certain oyster-grounds in Morris Cove, in accordance with, and by the lot numbers given on, a map made in May of that year, for the purpose, by Wm. Hartley, a county surveyor. When he made his survey he marked the situation of each lot by stakes, buoys or stones, and tagged one of the stakes with the number assigned to that lot on the map.

This map was drawn approximately, though not accurately, to a scale. The east and west side lines of each lot were at right angles to a base line upon the map drawn from a corner of a certain wharf to a point on the shore described as a white stone. Each side of each lot was 208.7 feet in length.

Both parties claim under the designations thus made, and the suit turns on the distance (which the map did not state) between the white stone and the corner of the nearest oyster lot (lot 2), which was in the first full range or tier, and next west of the base line. Other parallel tiers ran north of the first full tier, and in one of these, separated from it by eight tiers, was a lot marked lot 185. The defendants' lots were in the eighteenth range, and the plaintiff's in the nineteenth, on the south side of the first full tier.

The lots were mapped in parallel and contiguous tiers, so that they are related to each other like the squares on a checkerboard, and to locate the lines of one is therefore necessarily to give the key for locating those of any other.

Hartley was dead at the time of the trial. The plaintiff

produced one Talmadge as a witness, who was one of those to whom lot 185 was originally designated and who had owned it ever since, and offered to show by him that at the time of such designation there were stakes or buoys at each corner, and on one a certain stone, also, and that Hartley then gave him the location of the lot and pointed out the stakes. The evidence thus offered was excluded, as being an attempt to modify the description of the lot in the map by extrinsic matter having no connection with it.

In this there was error. In 1865 the laws respecting oyster culture were so amended as to make it a criminal offense for any "person or persons other than the committee appointed by law for that purpose or persons authorized by said committee," to "stake out or inclose any of the public grounds of the navigable waters of this State." Public Acts of 1865, p. 61, Chap. 56. Prior to that time the person to whom any such grounds had been designated by the committee was required to stake it out. Public Acts of 1855, p. 112, Chap. 92, § 2. In the Revision of 1866, which went into effect on January 1st of that year, this Act of 1855 appears unaltered in Chap. 2, § 61, on page 471, and that of the Act of 1865 became § 71, on page 473, which prescribes a pecuniary forfeiture for "every person, except the committee appointed for that purpose, who shall stake out, or enclose, any of the public grounds in the navigable waters of the State, for the purpose of planting oysters therein." If the later of these two sections qualified or repealed the directions given in the other, then only the oyster committee of the town of East Haven could lawfully have staked out the Talmadge lot in 1866; and if both sections are to stand together, it could also have lawfully staked it out. If, then, Talmadge, on taking possession in 1866, found the lot which was designated to him already staked out by Hartley, and it was Hartley who pointed out its distinguishing marks to him, it might fairly be presumed, in 1900, when the cause was heard, that Hartley did this in behalf of the committee; for he could not lawfully have set the stakes without their authority. *Ex diuturnitate temporis omnia praesumuntur rite et sollenniter esse acta.*

A staking out by the committee stands on the same footing, as a matter of evidence, as a staking out by a grantor of land when he delivers possession. It applies the written description to the land, and is entitled to great weight when that description is incomplete or ambiguous.

The committee occupied the place of a grantor as to both parties to this suit. Its acts, therefore, and those of its authorized agent, were admissible in favor of each party against the other, so far as they served as declarations of what the committee deemed the true bounds of any one of the lots designated; for to fix the lines of that tended, by reference to the map, to fix the lines of every other. *Deming* v. *Carrington*, 12 Conn, 1, 7; *Hill* v. *Bennett*, 23 id. 363.

Charles H. Townshend, who since 1866 had owned and occupied the northernmost tier of the lots delineated on this map, one of which was contiguous to lot 185, was a witness for the plaintiff, and was asked if the line between him and Talmadge ran from a drill hole in a rock on the shore, which Hartley had made in 1870. This question was properly excluded. His answer could only have been an opinion, and though supported by long possession, that possession might not have been in conformity with the original and true boundary.

In order to show the proper location of the white stone, the defendants were allowed to introduce a tracing made in 1891, by one Sanford, of a tracing then on file in the town clerk's office in East Haven, as a part of the files and records relating to oyster-grounds. The latter was one purporting to have been made by Hartley in 1866. It was a tracing of a part of his original map, but put the place of the white stone at a point considerably north of that marked as its site in that map, its distance from the nearest oyster lot (lot 2) being stated as 449 feet. This tracing had been accidentally destroyed by fire in 1892. The suit was brought in 1895 and tried in 1900. Sanford was produced as a witness, and testified that he was a civil engineer of over twenty years' experience; that he had made tracings of all maps of oyster-grounds on file in the town clerk's office in East Haven; that he had

copied from time to time twenty-five or thirty maps purport-
ing to have been made by Wm. Hartley, and to bear his sig-
nature; and was familiar with the handwriting on said maps,
but had never seen Hartley. He was then allowed to testify
that an inscription on the tracing burned, and traced in the
tracing made by himself, was, in his opinion, in Hartley's
handwriting. This inscription was to the effect that the trac-
ing was made by Hartley in 1866, for the oyster committee
of the town.

This Sanford tracing could not be treated as original evi-
dence of an ancient document, needing no proof. A tracing
marked as one by Hartley, and dated in 1866, if found at the
town clerk's office thirty years afterwards, would have proved
itself. This rule of evidence as to ancient documents found
in the proper custody, is founded on two things: the appear-
ance of the document itself, and the difficulty, if not impos-
sibility, of making extrinsic proof. *Enfield* v. *Ellington*, 67
Conn. 459, 463. In the case at bar the document was not
offered for inspection. That it could not be is of no con-
sequence. It never became an ancient document; and under
the rule in question the tracing by Sanford was no more
admissible in 1900 than it would have been, if offered in 1891,
when he made it.

But it was properly received as secondary evidence of the
original, upon his testimony that in his opinion the inscription
was in Hartley's handwriting. Hartley was dead. Both par-
ties were claiming under one of his maps. That was before
the court and it was undisputed that its inscription bore his
signature. The witness, in the exercise of his profession had
become familiar with it, and with many other maps inscribed
with what was apparently the same handwriting, and found
in public offices where maps of his making might naturally
be deposited. This was sufficient to qualify Sanford to
give his opinion as to who made it. It is not always neces-
sary that one whose opinion as to the genuineness of a sig-
nature is received in evidence should have special experience
and skill in the examination of handwriting in general. It
is enough if he can show special experience and skill in the

examination of the handwriting of the person whose signature is to be proved, and of whose handwriting an undisputed standard is before the court.

It is common to admit such testimony from those who have seen the person in question write; but the real value of any such evidence must always depend on the actual familiarity with his handwriting in general, which the witnesses may possess, whether gained from seeing him write often or from seeing often what he wrote. *Lyon* v. *Lyman*, 9 Conn. 55, 59, 62.

The relevancy of the tracing and of the figures upon it was beyond question. *Wooster* v. *Butler*, 13 Conn. 309.

The defendants introduced one Searle, another civil engineer, who testified that he made a survey of these grounds in 1885, and then placed an iron pipe in the ground at a certain point, which was in a projection of the boundary line in dispute; and also one Smith, who testified that a certain range line was pointed out to Searle, when he made his survey, as the north line on the tier of lots next north of the plaintiff's tier, and that Searle's east and west line between the plaintiff's and the defendants' lots corresponded with this range. On cross-examination Smith testified, without objection, that an iron pipe and cedar stake were placed by him on every east and west line at the time of the Searle survey and in conformity with it.

The plaintiff then, to show that Searle's survey was incorrect, and to fix the places where Searle had located these east and west lines, asked Smith if one of the pipes was placed at a certain point which was on a line at a considerable distance from those immediately in dispute. This question was excluded as not germane to the direct examination.

That it was germane to the preceding cross-examination was immaterial. The omission to object to the questions which had thus brought out new matter did not preclude an exception to continuing the inquiries further. That Smith, if such was the fact, had set one pipe on a wrong line, had so remote a tendency, if any, to show that a distant, though parallel, line did not conform to the true range, that the ex-

clusion of the question came fairly within the discretion of the trial court.

In rebuttal, the plaintiff put Searle on the stand, and for the same purpose to which his cross-examination of Smith had been directed, having shown by him that he made no map in 1885, but that he then gave the places for setting stakes for east and west lines on the oyster-grounds within which was the *locus in quo*, asked him over how much of the cove he ran these lines and gave the places for setting stakes. This was excluded as not matter in rebuttal.

Here there was error. Searle's testimony made an important part of the defendants' case. It went to fix the line in dispute by a definite monument. The lots west of the base line on the original Hartley map being all equal and contiguous squares, if any one of them was bounded by a line, the distance between which, at its intersection, when produced, with the base line and the white stone corresponded with the measurements on that map, then every line parallel to that, including the boundary between the lots in dispute, would be shown to be, if produced to a similar intersection, proportionately distant from the same point.

It may be that the plaintiff could have brought out the same facts by cross-examining Searle when produced by the defendants. But this could not prevent him, if he preferred that course, from showing them in rebuttal, for they went directly to attack the case which the defendants had made.

The defendants introduced evidence of declarations made by one Jacobs, an old inhabitant of the town, since dead, respecting the location of one of the range lines in dispute.

In rebuttal, the plaintiff offered evidence of other declarations as to certain of the lines in question, made by Jacobs nine years later, and after the controversy between the parties to this suit had arisen. No suit had then been brought, and there was no claim made that Jacobs knew of any dispute as to these lines; but the evidence was excluded.

This ruling was correct. It may seem hard that proof of the declarations made by Jacobs in 1884 could not be met by proof of inconsistent declarations made by him in 1893; but

the latter having been uttered after the dispute which resulted in this suit had arisen, do not carry that absolute assurance of sincerity and impartiality on which is rested this peculiar exception to the rule excluding hearsay evidence. 1 Greenl. on Ev., §§ 131, 133; Swift's Ev., 122, 123.

The finding was sufficient to present the questions of law on which the appellant relied, and the exceptions to it are overruled.

There is error and a new trial is ordered.

In this opinion the other judges concurred.